## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH KANE, *et al.*, | : | Civil No. 1:18-CV-02261 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| OLLIE'S BARGAIN OUTLET, INC., | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court is Plaintiffs' motion for conditional certification of a collective under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. (Doc. 48.)  This action was brought on behalf of a putative collective comprised of Co-Team Leaders ("CTL") employed by Defendant Ollie's Bargain Outlet, Inc. ("Ollie's") from March 12, 2015 to present day.  Plaintiffs are six former CTLs who allege that they were misclassified as exempt from the overtime provisions of the FLSA since they largely performed the work of hourly employees, rather than the managerial work listed in Ollie's CTL job description.  Two elements of Plaintiffs' case are fatal to the collective's success: (1) disparities exist among the putative collective members, including their locations of employment, their responsibilities at these locations, and their Store Team Leaders ("STL"); and (2) individualized inquiries would be required as to the applicability of FLSA overtime exemptions which would overwhelm and frustrate collective resolution.  Because

1

the court finds that Plaintiffs have not shown that they are similarly situated for purposes of collective administration under the FLSA, the court will deny the motion for conditional certification.  (Doc. 48.)

### PROCEDURAL HISTORY

Plaintiffs commenced this civil action on March 12, 2018, in the District of New Jersey alleging FLSA violations for unpaid overtime wages and that they were misclassified as exempt under the FLSA's overtime provisions.  (Doc. 1, pp. 11–14.)[1]  This case was transferred to the Middle District of Pennsylvania on November 26, 2018, since Ollie's is the sole defendant and maintains its headquarters in Harrisburg, Pennsylvania.  (*See* Docs. 12, 13.)  Plaintiffs seek to bring this lawsuit as a collective action on behalf of all CTLs who are or were formerly employed by Ollie's within the three years preceding this lawsuit.  (Doc. 1, ¶ 64.)

On February 15, 2019, the parties participated in a case management call with the court, during which their proposed case management plan was reviewed and adopted.  (Docs. 30, 31, 32.)  As part of their joint case management plan, the parties agreed that limited discovery would occur in connection with Plaintiffs' motion for conditional certification.  (Doc. 30.)  Based on the record before the court, it appears that this limited discovery included significant document

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

production, depositions of three Plaintiffs, the exchange of interrogatories, a Rule 30(b)(6) deposition, and the exchange of declarations from Plaintiffs and 56 CTLs employed by Ollie's across various locations and states.

On August 12, 2019, Plaintiffs filed a motion for conditional certification, attaching various discovery documents in support thereof.  (Doc. 48.)  Ollie's filed a brief in opposition, also including a voluminous discovery record in support thereof.  (Doc. 65.)  Plaintiffs timely filed a reply brief.  (Doc. 71.)  The parties have also filed notices of supplemental authority on March 23, 2020, and April 14, 2020.  (Docs. 72, 73, 74.)  Thus, the motion for conditional certification is now ripe for review.  On November 19, 2019, this case was reassigned to the undersigned.

## FACTUAL BACKGROUND

Ollie's is a bargain retail chain offering reduced prices on brand name merchandise that operates 345 retail locations across 25 states, including Alabama, Connecticut, Delaware, Florida, Georgia, Indiana, Kentucky, Maryland, Michigan, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, and West Virginia.  (Doc. 65, p. 14.)  At each of its retail locations, Ollie's is run by one STL, the equivalent of a store manager; one or more CTLs, the equivalent of an assistant manager; one or more Assistant Team Leaders ("ATL"), one of the individuals supervising the hourly

employees; various intermediate supervisors; and associate employees tasked with the bulk of the manual labor in each store.  (Doc. 48-5, p. 7; *see also* Doc. 48-26; Doc. 65-12.)

Based on Ollie's job description, CTLs are responsible for, *inter alia*, assisting the STL with managing payroll budgets, expenses, store banking, shrink reduction,[2] and completion of reports; merchandising the store; managing the process of moving freight from the delivery bay to the sales floor within 24 hours of its arrival; ensuring that associate employees are given daily tasks and remain productive; developing and executing plans for coaching, training, evaluating, supervising, and scheduling store associates; recruiting, interviewing, hiring, and onboarding new associates to ensure the staffing needs of the store are met; and performing all STL functions to open and close the store when needed.  (Doc. 65-22, p. 1.)  In addition, CTLs should be able to "effectively manage in a professional work environment."  (*Id.* at 2.)  Ollie's also sets physical requirements for its CTLs, including the ability to lift and carry up to 75 pounds; push and pull up to 35 pounds; stand for extended periods of time; bend and twist frequently; grip and reach with arms and hands frequently; and squat, kneel, balance, and climb occasionally.  (*Id.*)

---

[2] "Shrink" refers to the difference between what a store is supposed to have in terms of its merchandise versus what it actually has in stock.  (Doc. 65-10, p. 19.)

Plaintiffs are six former CTLs who were employed by Ollie's in New Jersey, Pennsylvania, North Carolina, and Virginia.  (Doc. 52.)  Plaintiffs allege that they did not perform the duties enumerated in the CTL job description that pertained to managerial work.  (Doc. 1, ¶ 46.)  Rather, Plaintiffs claim that the vast majority of their duties as CTLs involved the job description's physical requirements, which coincided with the responsibilities of hourly employees.  (*Id.* ¶¶ 47–49.)  Plaintiffs allege that they consistently worked over 40 hours per week, but did not receive additional compensation for this time since they were classified as exempt from the overtime provisions of the FLSA.  (*Id.* ¶¶ 15, 50.)  Thus, Plaintiffs assert that Ollie's misclassified them, and all other CTLs, as exempt under the FLSA.  (*Id.* ¶ 66.)

Because the court finds that there are differences between Plaintiffs' self-described job duties, the court includes a brief discussion of each plaintiff below.

### A. Named Plaintiff 1: Joseph Kane

Plaintiff Joseph Kane ("Kane") worked as a CTL for a total of 10 months from 2015 through 2016 in stores in New Jersey and Pennsylvania.  (Doc. 65-10, pp. 4, 6, 20.)  Kane asserts that he consistently worked between 55 and 60 hours per week, but admitted that he did not have any records to corroborate these hours

since he did not keep track of his time.[3]  (Doc. 48-14, pp. 3–4.)  During his time as

a CTL, Kane testified that the majority of his working hours were spent running

the cash register, cleaning the store, assisting customers, stocking shelves,

dropping top stock,[4] taking out the trash, unloading freight, unpacking

merchandise, recovering the store,[5] ticketing freight, loading customer

merchandise, building displays in accordance with corporate and STL directives,

and working alongside the hourly associate employees.  (*Id.* at 15–16; Doc. 65-10,

p. 17.)  In other words, Kane posits that he was a CTL in name only—he spent his

time performing the same work as hourly employees and relied on the STL to

provide him with direction.  (Doc. 65-10, pp. 6, 17.)

     However, Kane also testified that he performed certain job functions for

which hourly employees were not responsible.  For example, Kane expressed

---

[3] When asked about his knowledge of his hours worked, Kane testified that he remembered "the traffic flow when [he] would leave in the afternoon[ or] evening[,]" and that "[i]t would almost always be during rush hour."  (Doc. 48-14, pp. 3–4.)  In addition, he stated that if he was opening the store, he would be there between 6:00 or 7:00 a.m.  (*Id.* at 4.)  When asked if he ever complained about these hours, Kane responded: "No. Because retail being what it is and having worked in the business for a long time, there is not much I can do about it at this point. Just roll with the flow and eventually maybe I'd get some time back, but it never seemed to work that way."  (*Id.* at 5.)

[4] "Dropping top stock" is the process where extra merchandise is removed from the top shelf of displays to fill in gaps in displays on lower, more accessible shelves.  (Doc. 48-7, p. 6.)

[5] "Recovering the store" is the process where the store's displays are returned to their former, fully-stocked appearance.  In other words, anything out of place is returned to its original position.  (*Id.* at 7.)

familiarity with labor budgets, testifying that he would draft the first iteration of the schedule for the store based on his store's labor budget.  (*Id.* at 7.)  He also attended a hiring fair on behalf of Ollie's where he conducted interviews alongside his STL and recommended individuals for hire; thereafter, he completed onboarding paperwork for these new hires.  (*Id.* at 10–11.)  Moreover, Kane testified that he received a bonus of $1,500 based on his store's performance, a perk which hourly employees were ineligible to receive.  (*Id.* at 20.)

Kane's employment was terminated in June 2016 after he admitted to viewing inappropriate adult material on his tablet in the store.  (Doc. 65-17, p. 3.) According to his termination paperwork, Kane had received discipline for failing to complete his job duties on two prior occasions.  (*Id.*)

### B. Named Plaintiff 2: Candi Amuso

Plaintiff Candi Amuso ("Amuso") became a CTL in February 2016 in North Carolina.  (Doc. 48-7, p. 3; Doc. 65-23, p. 22.)  She began working at Ollie's in 2013 as a part-time seasonal employee, and was quickly promoted from a full-time seasonal employee, to a full-time employee, to an ATL, and finally to a CTL during the span of three years.[6]  (Doc. 65-23, pp. 4, 6.)  Amuso asserts that she consistently worked between 55 and 60 hours per week, but admitted that she did

---

[6] Amuso seemed confused by her promotions, unsure of why her STL continued to write positive performance reviews on her behalf.  (*See* Doc. 65-23, pp. 5–6.)

not have any records to corroborate these hours since CTLs did not have a time

clock.[7]  (Doc. 48-7, p. 5.)  Amuso testified that she performed the same duties at

every store in which she worked, spending 98 to 99% of her time running the cash

register, assisting customers, stocking, dropping top stock, taking out the trash,

unloading freight, unpacking merchandise, ticketing freight, loading customer

merchandise, building displays following corporate and STL directives, recovering

the store, and cleaning the store.  (*Id.* at 4, 6–8.)  Amuso testified that she

completed a draft of the employee schedule on a few occasions and completed a

safety checklist for the store, but that she largely performed the same work that she

did as a seasonal and hourly employee.  (Doc. 65-23, pp. 7–10.)  Thus, Amuso

appeared to engage in few activities in the store without the direction of one of her

superiors.  (*Id.* at 19.)

Amuso testified that she took little initiative in her capacity as a CTL,

viewed her role in the company as that of a robot, and was largely "committed to

making a paycheck," rather than performing the duties of a CTL as laid out in

Ollie's job description.  (*Id.* at 12.)  In sum, Amuso believed that she performed

approximately three of the sixteen responsibilities listed in the CTL job

---

[7] When asked how she remembered the number of hours she worked per week, Amuso testified that she "spent a lot of time away from [her] kids" since she did not see them in the morning or at night.  (Doc. 48-7, p. 5.)

description, one of which included having a positive attitude and interacting well with others in the store.  (*Id.* at 17.)

### C. Opt-In Plaintiff 1: Dorothy Benson

Plaintiff Dorothy Benson ("Benson") was employed as a CTL in Pennsylvania from September 2016 through September 2018.  (Doc. 48-8, p. 2.) Benson asserts that as a CTL, 90% or more of her time was spent performing manual labor tasks such as unloading trucks, processing freight, ticketing merchandise, moving merchandise onto the sales floor, operating the cash register, stocking shelves, and cleaning the store and bathrooms.  (*Id.* at 2–3.)  In other words, Benson claims that "[t]here was almost no task that [she] did in the store that was not also performed by the hourly associates."  (*Id.* at 3.)  To accomplish these tasks, Benson stated that she routinely stayed at work past the end of her shift, and consistently worked 50 to 60 hours per week for which she was not paid overtime.  (*Id.* at 4.)  Benson's employment was terminated in 2018 for failing to perform her job duties as a CTL after receiving performance counseling for these issues.  (Doc. 65-17, p. 1; *see also* Doc. 65-19.)

### D. Opt-In Plaintiff 2: Travis Brake

Plaintiff Travis Brake ("Brake") was employed as a CTL in North Carolina for four months in 2016.  (Doc. 48-9, p. 2.)  Brake asserts that he spent 90% or more of his time as a CTL performing manual labor tasks assigned by his STL,

including unloading trucks, processing freight, ticketing clothing, putting together furniture, operating the cash registers, stocking shelves, cleaning the store and bathrooms, and taking out trash.  (*Id.* at 2–3.)  Much like Benson, Brake asserts that "[t]here was almost no task that [he] did in the store that was not also performed by the hourly associates[,]" and that he spent 50 to 60 hours per week completing these tasks for which he was not paid overtime.  (*Id.* at 3–4.)  Brake testified that he was "doing way too much throughout the day to train people" or perform a managerial role since he was preoccupied with completing tasks assigned by his STL.  (Doc. 65-18, pp. 17–18.)  Brake stated that his store was chronically understaffed, and had a high turnover rate, factors which he believed played a significant role in his need to perform manual labor.  (*Id.* at 6, 21.)  Brake's employment was terminated on December 23, 2016 for interfering with an investigation of an associate employee regarding the theft of merchandise.  (Doc. 65-17, p. 2.)

### E. Opt-In Plaintiff 3: Brittany White

Plaintiff Brittany White ("White") was employed as a CTL in Virginia and North Carolina from July 2017 through August 2018.  (Doc. 48-10, p. 2.)  During her employment, White asserts that she spent 90% or more of her time performing manual labor-type tasks that were assigned to her by her STL, including stocking shelves, unloading trucks, ticketing merchandise, operating the cash registers,

10

cleaning the store and bathrooms, and taking out the trash.  (*Id.* at 2–3.)  As with

Benson and Brake, White claims that "[t]here was almost no task that [she] did in

the store that was not also performed by the hourly associates."  (*Id.* at 3.)  White

posits that she worked 50 to 60 hours per week and stayed past the end of her shift

to complete assigned tasks.  (*Id.* at 4.)  White's employment was terminated on

July 31, 2018 due to voluntary job abandonment.  (Doc. 65-17, p. 5.)

### F.  Opt-In Plaintiff 4: William Rich

Plaintiff William Rich ("Rich") was employed as a CTL in North Carolina

from April 2015 through April 2017.  (Doc. 48-11, p. 2.)  As with Benson, Brake,

and White, Rich alleges that he spent 90% or more of his time at work performing

manual labor-type tasks that were assigned by his STL, including unloading trucks,

merchandising, operating the cash registers, cleaning the store and bathrooms, and

taking out the trash.  (*Id.* at 2–3.)  Like others, Rich claims that "[t]here was almost

no task that [he] did in the store that was not also performed by the hourly

associates."  (*Id.* at 3.)  Rich posits that he worked 50 to 60 hours per week and

stayed past the end of his shift to complete tasks.  (*Id.* at 4.)

Rich admitted that he would have been exempt under the FLSA if he

performed everything that was included in the CTL job description, but asserted

that the persistent understaffing in his store prevented him from completing

managerial tasks.  (Doc. 65-32, p. 4.)  However, Rich testified that he performed

various tasks that were not assigned to hourly employees.  For example, Rich

drafted the schedule to be reviewed by his STL, typed employee evaluations, and

participated in the interviewing and hiring process for new associates, although he

disputes that the nature and extent of his involvement in any of these activities was

meaningful.  (*Id.* at 13–14.)  Rich's employment was terminated on April 3, 2017

for failing to secure his store by setting the alarm system while he went to the

bank.  (Doc. 65-17, p. 4.)  Rich had been previously disciplined for similar

behavior, and was thus terminated for his second violation.[8]  (*Id.*)

### G. Ollie's Discovery Production

In contrast to Plaintiffs' assertions that they spent the majority of their time

at work performing manual labor and non-managerial tasks, Ollie's has produced

56 declarations from CTLs across the country which directly contradict Plaintiffs'

assertions.  (*See* Doc. 65-6.)  These declarations indicate that the role of the CTL is

largely the same as the STL, and that CTLs must be prepared to perform the same

functions as their STL.  (*See id.* at 4, 6, 13, 16, 19, 39–40, 72, 83, 100–01, 105,

108, 113, 121, 127, 143, 147, 151, 164, 172, 178, 181, 185, 193, 216, 229.)  In

many cases, CTLs work hand-in-hand with their STL to ensure that the store

---

[8] The court notes that Rich's notice of termination appears on a document titled "Associate
Performance Counseling," and that the box checked under "type of action" is "written warning."
(Doc. 65-17, p. 4.)  However, the form states that Rich's "employment is being terminated
effective immediately[,]" and the parties do not dispute that Rich was terminated on April 3,
2017.  (*Id.*)

functions properly. (*See id.* at 4, 6, 13, 15, 18, 37, 48, 63, 72, 83, 98, 101, 105, 108, 113, 121, 127, 130, 141, 147, 181, 185, 204, 212, 224.) These declarations also indicate that the role of a CTL in a given store can vary, and depends on the store's STL and the STL's management style. (*See id.* at 23, 32–33, 35, 44, 133, 136, 150, 162–63, 189, 222; *see also* Doc. 65-9, pp. 17–18.) While some CTLs may perform manual labor, they assert that it is never for an appreciable period of time and is usually incidental to their management duties. (*See* Doc. 65-6, pp. 7, 52, 62, 73, 77, 90, 139–40, 157, 168, 181.)

Because of the managerial role that CTLs play, they are compensated at a higher rate of pay than hourly employees, including being eligible for bonuses. (*See id.* at 10, 26, 41, 106, 111.) Indeed, Plaintiffs acknowledge that they were paid at a higher rate than hourly employees due to their more advanced position in management. (Doc. 65-23, p. 19; 65-32, p. 9.)

Ollie's Rule 30(b)(6) designee, Scott Osborne ("Osborne"), testified that the CTL position is intended to be a stepping stone for the STL position. (Doc. 65-9, p. 5.) In other words, Ollie's anticipates that CTLs will eventually assume the role of an STL. (*Id.*) Indeed, Osborne testified that Ollie's restructured its CTL position in 2012 to add more managerial responsibilities to the CTL's role and to expand Ollie's Leadership Institute, a program designed to add opportunities for promotion and growth within Ollie's stores. (Docs. 65-11; 65-12; 65-14; 65-15.)

**JURISDICTION AND VENUE**

Plaintiffs allege violations of the FLSA. (*See* Doc. 1.) Pursuant to 28 U.S.C. § 1331, the court has jurisdiction over claims that arise under the laws of the United States. Venue is also appropriate because Ollie's is the sole defendant and maintains its headquarters within the Middle District of Pennsylvania.

**STANDARD OF REVIEW**

Under the FLSA, employers are obligated to pay employees a minimum of one and a half times their rate of pay for all hours worked in excess of forty hours per week. *See generally* 29 U.S.C. § 201, *et seq.* As an enforcement mechanism for employers who do not comply with these responsibilities, the FLSA allows an employee to bring an action "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

Employees choosing to bring an action on behalf of themselves and others may bring a collective action in which they face two hurdles before such action may proceed under the FLSA. *See Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1523 (2013). This two-step procedure is not contained within the FLSA. However, it has been endorsed by the Third Circuit as the proper approach for collective certification analysis. *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (citing *Symczyk*, 656 F.3d at 193 n.5).

## A. First Step of the Certification Analysis

First, the court must ascertain whether the putative collective is similarly situated to the named plaintiff. *Id.* In other words, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 193 (citing *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 U.S. Dist. LEXIS 21010, at *10 (E.D. Pa. Nov. 13, 2003)). Courts in this circuit have described this burden as a "modest factual showing" in which the court exercises its discretion to enable the parties to send notice to potential collective members. *Symczyk*, 656 F.3d at 192–93 (citing *Wright v. Lehigh Valley Hosp.*, No. 10-431, 2010 U.S. Dist. LEXIS 86915, at *7–10 (E.D. Pa. Aug. 24, 2010) (canvassing cases)); *Zavala*, 691 F.3d at 536.

If a plaintiff meets this burden, the court will "conditionally certify" the collective such that pretrial discovery may proceed, and notice may be sent to putative members of the collective, who may then affirmatively opt in to the litigation. *Symczyk*, 656 F.3d at 192.

## B. Intermediate Standard of Review at the First Step of the Certification Analysis

Some district courts within the Third Circuit have applied an intermediate standard of review for the first step of this certification process when the parties

have already engaged in some measure of discovery.  *See Sloane v. Gulf Interstate Field Servs.*, No. 4:16-cv-01571, 2017 U.S. Dist. LEXIS 43088, at *17 (M.D. Pa. Mar. 24, 2017); *Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007).  Courts utilizing this standard recognize that:

> applying the intermediate approach helps "the Court [to] make an educated decision as to whether certifying this matter as a collective action would survive the decertification process."  To proceed otherwise "would be an exercise in futility and wasted resources for all parties involved."  "Although the burden for certifying a FLSA lawsuit for collective action notification is light, there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute."  "Consistent with this principle, courts have the responsibility to avoid 'stirring up' litigation through unwarranted solicitation."

*Sloane*, 2017 U.S. Dist. LEXIS 43088 at *17 (citations and footnotes omitted). Thus, an intermediate standard of review reconciles the parties' advanced discovery positions with the court's typical reliance solely "on the pleadings and affidavits . . . to determine the suitability of conditional certification." *Waltz v. Aveda Transp. & Energy Servs.*, No. 4:16-cv-00469, 2016 U.S. Dist. LEXIS 178474, at *5 (M.D. Pa. Dec. 27, 2016) (citing *Villanueva-Bazaldua*, 479 F. Supp. 2d at 415).  In other words, an intermediate standard mandates that "from the plaintiff to whom much discovery is given, much proof is expected in return." *Sloane*, 2017 U.S. Dist. LEXIS 43088 at *15.

The Southern District of Illinois has aptly summarized the need for an intermediate approach in light of the procedural challenges facing courts where the

parties have engaged in discovery, yet only seek conditional certification. *See Bunyan v. Spectrum Brands, Inc.*, No. 07-cv-0089, 2008 U.S. Dist. LEXIS 59278 (S.D. Ill. Jul. 31, 2008).

> It is clear that the parties have conducted a substantial amount of discovery in this case. They have exchanged interrogatories, conducted depositions, and exchanged a large number of documents. The Court cannot close its eyes to the amount of discovery already performed in this action. At the same time, the Court is cognizant that Plaintiffs only seek conditional certification at this point and that discovery is not complete. Taking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time. Additionally, because discovery is not yet complete, conditional certification, if granted, permits Defendants to make a fully informed challenge to certification once discovery concludes. As such, the Court's analysis proceeds under the intermediate approach.

*Id.* at *4.

Indeed, several district courts outside of this Circuit have found the intermediate approach to conditional certification prudent. *See, e.g.*, *McClean v. Health Sys.*, No. 11-3037, 2011 U.S. Dist. LEXIS 142283, at *10–13 (W.D. Mo. Dec. 12, 2011) (adopting an intermediate standard where some measure of discovery was completed); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302, at *15–18 (W.D.N.C. Sept. 16, 2011) (noting that while significant discovery had not yet occurred, "the Court cannot ignore the fact that the parties requested, and engaged in, some discovery on the certification issue"); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870,

895 (N.D. Iowa 2008) (applying "the more onerous second stage analysis to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs"); *Thiessen v. GE Capital Corp.*, 996 F. Supp. 1071, 1080–81 (D. Kan. 1998) (noting that where the parties had already conducted three months of discovery, the plaintiff was clearly "beyond the 'notice stage,'" and application of an intermediate standard was appropriate).

## C. Second Step of the Certification Analysis

Regardless of which standard is used for the first step of the certification analysis, under the second hurdle, the court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Id.* at 193 (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)). This second stage typically occurs after the parties have engaged in substantial discovery and have assembled "a much thicker record" on which a court may evaluate the relative positions and similarities of the putative collective members. *Symczyk*, 656 F.3d at 193 (quoting *Morgan*, 551 F.3d at 1261). Once the court has the benefit of this added discovery, it may consider, *inter alia*:

> whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have

18

similar salaries and circumstances of employment.  Plaintiffs may also
be found dissimilar based on the existence of individualized defenses.

*Zavala*, 691 F.3d at 536−37 (citing *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 389 n.17

(3d Cir. 2007); 45C Am. Jur. 2d Job Discrimination § 2184).  The Third Circuit

has emphasized that these enumerated factors are not exhaustive, and that the

plaintiff must satisfy his or her burden at the second stage by establishing that the

plaintiffs who have opted in are similarly situated to the named plaintiffs by a

preponderance of the evidence.  *Zavala*, 691 F.3d at 537; *Symczyk*, 656 F.3d at 193

n.6.  Thus, plaintiffs face a more demanding burden at the second stage of the

collective certification analysis.  *Zavala*, 691 F.3d at 534.

### D. The Parties' Dispute—Modest Factual Showing Versus Intermediate Approach

In this case, the parties disagree regarding which standard is applicable at the

first step—the modest factual showing or the intermediate approach.  Plaintiffs

argue that the court should apply the modest factual showing standard since

Plaintiffs only seek conditional collective certification, the consequences of which

merely involve sending notice to potential collective members.  (Doc. 48-1, pp.

17−23.)  Plaintiffs assert that they have satisfied their modest factual burden

because they have produced evidence that Ollie's classifies all CTLs as exempt

from the overtime provisions of the FLSA regardless of any distinguishing

characteristics they may have.  (*Id.* at 21.)  Despite this blanket characterization,

Plaintiffs have testified and declared that their job duties involved performing the work of non-exempt hourly employees, that they consistently worked in excess of 40 hours per week, and that they were not paid overtime for any of these hours worked in excess of 40 hours per week.  (*Id.*)  Plaintiffs urge the court to disregard Ollie's' 56 declarations submitted in opposition to the motion, reiterating that Plaintiffs have only moved for conditional certification, and that evidence outside of the complaint and accompanying affidavits should not be considered in light of the procedural posture of the case.  (*Id.* at 23.)

For its part, Ollie's asserts that the intermediate standard of review is appropriate here due to the extensive discovery that the parties have completed, but that Plaintiffs cannot meet even the modest factual showing that they are entitled to conditional certification.  (Doc. 65, p. 27.)  Ollie's argues that Plaintiffs have not established that they are similarly situated for purposes of collective management. (*Id.* at 28.)  Specifically, Ollie's posits that the court would be required to conduct an individualized inquiry into the job duties that each Plaintiff performed since Plaintiffs rely on a common job description as support for conditional certification, yet present declarations and testimony demonstrating that the job duties they actually performed deviated from this description to varying degrees.  (*Id.* at 28–41.)  Ollie's further claims that its own 56 declarations, combined with its evidence that five out of the six Plaintiffs faced employment termination for poor

performance or job abandonment, demonstrate that CTLs perform different job duties depending on their store needs, STL, and individual initiative.  (*Id.*)  Thus, according to Ollie's, Plaintiffs' reliance on blanket classification for purposes of collective certification and administration is inappropriate and would result in an unmanageable collective.  (*Id.* at 46.)

The court notes that both parties have strong arguments in support of their proposed standard of review for this case.  However, the court finds that the intermediate standard is more appropriate here to best serve the interests of judicial economy and achieve an efficient resolution of this case.  As the *Sloane* court quipped, "from the plaintiff to whom much discovery is given, much proof is expected in return."  2017 U.S. Dist. LEXIS 43088 at *15.  The parties have voluntarily engaged in discovery in this case involving significant document production, depositions of three Plaintiffs, exchange of interrogatories, a Rule 30(b)(6) deposition, and declarations being submitted from Plaintiffs and 56 CTLs employed by Ollie's across its various locations.  The parties chose to engage in this discovery as requested in their joint case management plan.  (*See* Doc. 30.) The parties have attached the voluminous discovery record to their briefing for the motion for conditional certification.  (*See* Docs. 48, 52, 65, 66, 71.)  "The [c]ourt cannot close its eyes to the amount of discovery already performed in this action." *Bunyan*, 2008 U.S. Dist. LEXIS 59278 at *4.  Indeed, "it would be an entirely

inefficient use of resources for [the court] to conditionally certify a collective action, only to double-back because the bulk of the discovery it already considered has cast an ominous shadow upon the propriety of the ultimate merits." *Sloane*, 2017 U.S. Dist. LEXIS 43088 at *22. Thus, the court finds it appropriate to consider the discovery submitted in this case, despite its preliminary procedural posture.

Despite this conclusion, the court also notes that the Third Circuit has not had the opportunity to consider whether this Circuit should apply the intermediate standard in cases such as this where some measure of discovery has already occurred. Thus, out of an abundance of caution, the court will also review the conditional certification question under the modest factual showing standard.

## DISCUSSION

### A. Plaintiffs Are Not Entitled to Conditional Certification Under the Intermediate Standard.

In considering discovery under the intermediate standard, with an eye toward determining whether the plaintiffs are similarly situated, courts have found it appropriate to divide their analysis into three parts: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations." *Sloane*, 2017 U.S. Dist. LEXIS 43088 at *27–28 (quoting *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 10-948, 2011 WL 6372852, at *3 (W.D. Pa. Dec. 20, 2011)).

First, the court considers the "plaintiffs' job duties, geographical location, supervision, and salary." *Id.* at \*28 (quoting *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011)).  Second, the court considers whether defenses raised by the defendant would apply to the collective as a whole or with respect to individual opt in plaintiffs.  *Id.* (quoting *Andrako*, 788 F. Supp. 2d at 378).  Finally, the court considers questions of fairness, efficiency, and procedural considerations—whether the collective would require an individual inquiry into each plaintiff, rather than an examination of the collective's employment situation. *Id.* (quoting *Lusardi v. Xerox Corp.*, No. 83-809, 118 F.R.D. 351, 360 (D.N.J. Nov. 5, 1987)).

As part of the court's responsibility in conducting this analysis, the court must consider section 216(b)'s primary objectives: (1) lowering costs for plaintiffs by pooling resources; and (2) limiting controversies to one proceeding which can efficiently resolve "common issues of law and fact that arose from the same alleged activity." *Id.* at \*28–29 (quoting *Moss v. Crawford & Co.*, No. 98-1350, 201 F.R.D. 398, 410 (W.D. Pa. Sept. 21, 2000)).  Part of this consideration is whether the court can "coherently manage the class in a manner that will not prejudice any party." *Id.* at \*29 (quoting *Moss*, 201 F.R.D. at 410).

Turning to the first factor, the disparate factual and employment settings of the individual Plaintiffs, the court finds that there are disparities between Ollie's

job description and the work Plaintiffs assert that they completed.  The record

demonstrates that Ollie's maintains a uniform job description for its CTLs, which,

if uniformly followed, would result in all CTLs being classified as exempt.[9]  (Doc.

48-5, pp. 38–40.)  However, Plaintiffs present a conflicting account of their job

duties which bear little resemblance to Ollie's official CTL job description.

Further, the record assembled from a fraction of the potential collective members

in this case indicates that the responsibilities of CTLs can vary drastically.

For example, Amuso testified that she took little initiative in her capacity as

a CTL, viewed her role in the company as that of a robot, and was largely

"committed to making a paycheck," rather than performing the duties of a CTL as

laid out in Ollie's job description.  (Doc. 65-23, p. 12.)  In sum, Amuso believed

that she performed approximately three of the sixteen responsibilities listed in the

CTL job description, one of which included having a positive attitude and

interacting well with others in the store.  (*Id.* at 17.)  In stark contrast, CTL Alayna

Ahlborn ("Ahlborn") declared that she routinely made decisions about who to hire,

assigned tasks for associate employees, merchandised the store, oversaw the

orientation and training process for new associates, made recommendations on

employees' compensation, conducted associate performance reviews, and handled

---

[9] Even Rich admits that he would have been exempt under the FLSA if he performed everything
that was included in the CTL job description.  (Doc. 65-32, p. 4.)

customer and employee issues and complaints when they arose.  (Doc. 65-6,

pp. 1–4.)  Ahlborn stated that she performed her job with little oversight and

generally worked collaboratively with her STL when the STL was in the store.  (*Id.*

at 4.)

The notion that CTLs' duties can vary is supported by the record from both

Plaintiffs' and Ollie's declarations and depositions.  While some CTLs testified

that their role is largely the same as the STL and that they work hand-in-hand with

their STL, other CTLs viewed their role as subservient to that of their STL and

merely performed tasks assigned to them.  (*Compare* Doc. 65-6, pp. 4, 6, 13,

15–16, 18–19, 37, 39–40, 48, 63, 72, 83, 98, 100–01, 105, 108, 113, 121, 127,

130, 141, 143, 147, 151, 164, 172, 178, 181, 185, 193, 204, 212, 216, 224, 229,

*with* Doc. 48-14, pp. 15–16; Doc. 65-10, pp. 6, 17; Doc. 65-23, p. 19; Doc. 48-9,

pp. 2–3; Doc. 48-10, pp. 2–3; Doc. 48-11, pp. 2–3.)  These declarations also

indicate that the role of a CTL can vary depending on the store's STL and the

STL's management style.  (*See* Doc. 65-6, pp. 23, 32–33, 35, 44, 133, 136, 150,

162–63, 189, 222; *see also* Doc. 65-9, pp. 17–18.)

In addition, the record reflects a disparity in the amount of manual labor that

CTLs perform.  Specifically, while some CTLs assert that they are not required to

perform manual labor for an appreciable period of time or that manual labor is

incidental to their management duties, others testify that almost their entire day is

spent performing manual labor.  (*Compare* Doc. 65-6, pp. 7, 52, 62, 73, 77, 90,

139–40, 157, 168, 181, *with* Doc. 48-14, pp. 15−16; Doc 65-10, pp. 6, 17; Doc.

48-7, pp. 4, 6−8; Doc. 48-4, pp. 2−3; Doc. 48-9, pp. 2−3; Doc. 48-10, pp. 2−3;

Doc. 48-11, pp. 2−3.)  Further, some CTLs attribute their need to perform manual

labor to chronic understaffing at their store, while others assert that they were

required to perform these duties as assigned by their STL.  (*Compare* Doc. 65-32,

p. 4; Doc. 65-18, pp. 6, 21, *with* Doc. 65-23, pp. 7−10, 19.)

The court finds that the sole similarity among all CTLs on the record is their

compensation.  It is undisputed that CTLs are compensated at a higher rate of pay

than hourly employees, including being eligible for bonuses.  (*See* Doc. 65-6,

pp. 10, 26, 41, 106, 111.)  Indeed, Plaintiffs acknowledge that they were paid at a

higher rate than hourly employees due to their more advanced position in

management.  (Doc. 65-23, p. 19; 65-32, p. 9.)  Thus, the first factor weighs

against conditional certification due to the disparity in CTLs' job duties.

The second factor, the various defenses available to the defendant, likewise

cuts against conditional certification in this case.  Ollie's has primarily asserted

that its CTLs are exempt for purposes of the overtime provisions of the FLSA

because CTLs fall within the FLSA's administrative and/or executive

exemptions.[10]  (Doc. 65, p. 29.)  As many courts have recognized, determining the applicability of exemptions under the FLSA involves a fact-specific inquiry, often ill-suited to resolution in the context of a collective action.  *See, e.g.*, *Espinoza v. Atlas R.R. Constr., LLC*, 657 F. App'x 101, 108 n.3 (3d Cir. 2016) (citing *Carey v. Nat'l Event Servs., Inc.*, No. 14-cv-5006, 2015 WL 667519, at *5 (E.D. Pa. Feb. 13, 2015) (noting that determining an employee's duties for purposes of FLSA exemption applicability is a fact-specific inquiry)); *Sloane*, 2017 U.S. Dist. LEXIS 43088 at *39 ("Application of the administrative exemption is fact specific.") (quoting *Williams v. U.S. Bank Nat'l Ass'n*, No. 12-1907, 290 F.R.D. 600, 606 (E.D. Cal. Jun. 20, 2013)); *Gallagher v. Lackawanna Cty.*, No. 3:07-cv-912, 2008 U.S. Dist. LEXIS 43722, at *28 n.8 (M.D. Pa. May 30, 2008) (collecting cases) (noting that "[c]ourts denying conditional certification have done so where the FLSA claims involve fact-specific inquiries into the duties of an employee to

---

[10] The administrative exemption is applicable to employees who: "(1) earn a certain minimum salary; (2) have as their primary duty the performance of office or non-manual work directly related to management or business operations of the employer or the employer's customers; and (3) have the primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance."  *Clark v. Del. Valley Sch.*, 450 F. Supp. 3d 551, 563 (M.D. Pa. 2020); *see also* 29 C.F.R. § 541.200(a).  The executive exemption is applicable to employees who: (1) earn a certain minimum salary; (2) have as their primary duty the management of the employer; (3) customarily and regularly direct the work of two or more employees; and (4) have the authority to hire or fire employees or have the ability to suggest or recommend hiring, firing, advancement, or promotion of employees, whose suggestion or recommendation is given particular weight.  29 C.F.R. § 541.100(a).

determine whether the employee was properly classified as exempt from the overtime requirement or as an independent contractor").

Based on the record, the court finds that the fact-specific nature of these inquiries, i.e., whether one or more exemptions under the FLSA apply to Plaintiffs, weighs against conditional certification in this case. The record indicates that CTLs had varying levels of responsibility at different stores and that not all CTLs performed the same job duties. While some CTLs assert that they were responsible for managing other employees; making recommendations for hiring, firing, or promoting employees; exercising independent judgment; or performing non-manual labor, others allege that they did not perform any of these tasks on a routine basis, or perhaps at all. (*Compare* Doc. 65-6, pp. 4, 6, 13, 15−16, 18−19, 37, 39−40, 48, 63, 72, 83, 98, 100−01, 105, 108, 113, 121, 127, 130, 141, 143, 147, 151, 164, 172, 178, 181, 185, 193, 204, 212, 216, 224, 229, *with* Docs. 48-4; 48-7; 48-8; 48-9; 48-10; 48-11.)

Thus, the court finds that individualized inquiries would be required as to the applicability of FLSA exemption provisions to each Plaintiff in this case. For instance, the court may find that some CTLs were properly classified as exempt, but that others were not based on their alleged duties and responsibilities. This potential difference in outcome for Ollie's' defenses is not conducive to collective

management and indicates that denial of collective certification would be
appropriate.

Finally, the court turns to questions of fairness, efficiency, and procedural
issues.  The court finds that, in light of these vast differences among the job duties
of the CTLs on the record before the court, which is made up of declarations and
testimony from only a fraction of Plaintiffs' proposed collective, Plaintiffs'
proposed collective is simply too broad to be similarly situated for purposes of
collective management.  Plaintiffs seek to conditionally certify a collective of <u>all</u>
current and former CTLs employed by Ollie's nationwide from March 12, 2015 to
present day.  (Doc. 48, p. 1; Doc. 48-1, pp. 6–7.)  Thus, based on Plaintiffs'
defined collective, the court must potentially consider the duties performed by over
1,000 CTLs across 345 stores in 25 states to determine whether one or more FLSA
exemptions are applicable.  (Doc. 65, p. 12 n.3.)  Plaintiffs' proposed collective
places the court in a position where it could find that one or more FLSA
exemptions are applicable to some Plaintiffs, but not the entire collective.  In sum,
there is no efficiency to conditionally certifying this collective action and the court
cannot coherently manage the collective in a manner that will not prejudice any
party.

Considering all of the foregoing factors, the court finds that none weigh in
favor of granting conditional certification and that Plaintiffs' proposed class is too

broad to make collective management possible.  Therefore, applying the

intermediate standard of review, the court will deny Plaintiffs' motion for

conditional certification.  (Doc. 48.)

**B. Plaintiffs Are Not Entitled to Conditional Certification Under the Modest Factual Showing Standard.**

Even if the intermediate standard were inapplicable in this case, however,

Plaintiffs have failed to satisfy their burden under the modest factual showing

standard.  Plaintiffs must "produce some evidence, 'beyond pure speculation,' of a

factual nexus between the manner in which the employer's alleged policy affected

her and the manner in which it affected other employees." *Symczyk*, 656 F.3d at

193 (citing *Smith*, 2003 U.S. Dist. LEXIS 21010 at *10).  Plaintiffs have shown

that Ollie's maintains a policy of classifying all CTLs as exempt from FLSA

overtime provisions regardless of the CTL's state, district, region, size of store,

number of employees, sales volume, experience, training, STL, DTL, duties, tasks,

responsibilities, or shift.  (Doc. 48-5, pp. 9–11.)  Plaintiffs have also shown that

they are subject to this policy as CTLs employed at Ollie's stores across four

different states.  However, Plaintiffs have failed to show that their misclassification

challenge to Ollie's policy is more broadly applicable to CTLs other than

themselves.

Initially, the court finds that there are meaningful differences in each

Plaintiff's testimony that would require the court to conduct individualized

inquiries to determine whether the FLSA exemption provisions would apply.  For example, Kane testified that he performed certain job functions for which hourly associate employees were not responsible, including drafting a weekly schedule in compliance with his store's labor budget; attending a hiring fair where he conducted interviews and made recommendations for individuals to hire; and received an annual bonus based on his store's performance.  (Doc. 65-10, pp. 7, 10–11, 20.)  Amuso also testified that she prepared a draft of her store's schedule and completed a safety checklist, additional tasks that hourly associate employees would not have completed.  (Doc. 65-23, pp. 7–10.)  In contrast, Benson and White declared that they spent 90% or more of their time performing manual labor tasks and that "[t]here was almost no task that [they] did in the store that was not also performed by the hourly associates."  (Doc. 48-8, pp. 2–3; Doc. 48-10, pp. 2–3.)  Presenting yet another version of CTL duties are Brake and Rich, who testified that their stores were chronically understaffed, which they believe precipitated their manual labor assignments.  (Doc. 65-18, pp. 6, 21; Doc. 65-32, p. 4.)  However, Rich appeared to find time to draft the schedule for his store, type employee evaluations, and participate in the interviewing and hiring process for new associates.  (Doc. 65-32, pp. 13–14.)  Thus, the court has been presented with Plaintiffs who have varying levels of responsibility across different stores with different STLs and different staffing needs.

These differences are further exaggerated when considering Ollie's job description for CTLs and Ollie's declarations from CTLs who could potentially opt into this litigation.  Ollie's job description and its CTL declarations indicate that— both by design and as a practical matter—CTLs spend the majority of their time managing the store and performing exempt tasks, including managing payroll budgets, expenses, store banking, shrink reduction, and completion of reports; merchandising the store; managing the process of moving freight from the delivery bay to the sales floor within 24 hours of its arrival; ensuring that associate employees are given daily tasks and remain productive; developing and executing plans for coaching, training, evaluating, supervising, and scheduling store associates; recruiting, interviewing, hiring, and onboarding new associates to ensure the staffing needs of the store are met; and performing all STL functions to open and close the store when needed.  (Doc. 65-22, p. 1; *see also* Doc. 65-6.) When considered in this light, Plaintiffs' declarations and testimony read more like challenges to their individual treatment, rather than a challenge to Ollie's overarching classification of its CTLs.  Challenges such as these have already been considered and rejected by other courts.  *See Bramble v. Wal-Mart Stores, Inc.*, No. 09-4932, 2011 U.S. Dist. LEXIS 39457, at *27–28 (E.D. Pa. Apr. 11, 2011); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003).

In addition, where, as here, the collective is based on the alleged misclassification of employees under the FLSA, individualized factual determinations are almost always present to ascertain whether an exemption is applicable to a given employee. With just the six Plaintiffs presently involved in this litigation, the court would need to conduct an examination of each Plaintiff's duties and responsibilities to determine whether they would be exempt from the FLSA's overtime provisions.

This obligation would be greatly expanded in the event that additional plaintiffs opted into this litigation, especially given that Plaintiffs anticipate a collective of over 1,000 CTLs. Many courts have denied conditional certification under similar circumstances where the putative collective would involve individualized inquiries regarding the plaintiffs' FLSA exemption eligibility. *See, e.g.*, *Harriel v. Wal-Mart Stores, Inc.*, No. 11-2510, 2012 U.S. Dist. LEXIS 97527, at *16 (D.N.J. July 13, 2012) (noting that the court was not required to infer that other employees would have also deviated from the written job description to spend most of their time performing non-managerial tasks and denying conditional certification under the modest factual showing standard); *Bramble*, 2011 U.S. Dist. LEXIS 39457 at *27–28 (denying conditional certification under modest factual showing standard where plaintiffs shared the same job title and job description, but where the court would need to conduct individualized inquiries regarding FLSA

33

exemption applicability); *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-4100, 2011

U.S. Dist. LEXIS 15759, at *22 (D.N.J. Feb. 15, 2011) (noting that "employees

with the same job title are not 'similarly situated' for the purposes of an 'opt-in'

FLSA class if their day-to-day job duties vary substantially" when considering a

motion for decertification) (quoting *King v. West Corp.*, No. 8:04-cv-318, 2006

U.S. Dist. LEXIS 3926, at *43 (D. Neb. Jan. 13, 2006)); *Holt v. Rite Aid Corp.*,

333 F. Supp. 2d 1265, 1270–72 (M.D. Ala. 2004) (applying a "rudimentary

showing" standard and finding that the similarly situated inquiry "must be

analyzed in terms of the nature of the job duties performed by each putative

plaintiff, because the ultimate issue to be determined is whether each employee

was properly classified as exempt"); *Mike*, 274 F. Supp. 2d at 221 (applying a

modest factual showing standard and holding that a plaintiff claiming that he was

misclassified as exempt was essentially challenging his individual treatment, rather

than his employer's classification policy).

> Thus, the court finds that denial of conditional certification is inappropriate

in this case in light of the vast array of different job duties presented in the

relatively small sample of the potential collective members under current

consideration.  The court would need to conduct individualized inquiries into each

Plaintiff's job duties—a task ill-suited for collective resolution.  Therefore, on

these additional grounds, the court will deny Plaintiffs' motion for conditional

certification.  (Doc. 48.)

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for conditional certification

will be denied.  (Doc. 48.)  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: November 24, 2020